Case 1:14-cv-05296-WFK   Document 1   Filed 09/10/14   Page 1 of 14 PageID #: 1



IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 1 0 2014 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LEIGH CASTERGINE,

                            Plaintiff,

              - against -

STERLING METS FRONT OFFICE, L.L.C. and
JEFFREY WILPON,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CV 14 COMPLAINT 5296**

PLAINTIFF DEMANDS
A TRIAL BY JURY

**KUNTZ, J.**

**GOLD, M.J**

       Plaintiff Leigh Castergine ("Castergine" or "plaintiff"), through her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendants Sterling Mets Front Office, L.L.C. ("the Mets" or "the Team") and Jeffrey Wilpon ("Wilpon") (collectively "defendants"), as follows:

NATURE OF ACTION

       1.    Castergine is an Ivy League graduate and former Division 1 student athlete. After successful stretches with several large market professional sports franchises, she was recruited to lead and modernize the Mets Ticket Sales and Service Operations. As the Senior Vice President for Ticket Sales and Service, she excelled in that role in the face of extraordinary challenges. In particular, the Team's front office has failed to field a winning team in six years, including 2014, and has made a series of public relations blunders that too frequently led to the franchise being ridiculed in the sports pages. Despite these challenges, the Mets recognized and rewarded Castergine's accomplishments through annual six-figure bonuses, significant raises and a promotion to the position of Senior Vice President – the first woman to hold such a position in the Team's fifty-two year history. Until, that is, Castergine announced she was pregnant. Wilpon, the Team's Chief Operating Officer and son of the principal owner,

became fixated on the idea that Castergine would have a child without being married. He frequently humiliated Castergine in front of others by, among other things, pretending to see if she had an engagement ring on her finger and openly stating in a meeting of the Team's all-male senior executives that he is "morally opposed" to Castergine "having this baby without being married." Wilpon told Castergine that, when she gets a ring, she will make more money and get a bigger bonus. Castergine complained to the Team's Human Resources Department. Wilpon responded by firing Castergine. According to Wilpon, "something had changed" in Castergine after the birth of her child – with still no ring on her finger. Wilpon told her that she was no longer as "aggressive" as she used to be.

2.      Castergine brings this action to remedy discrimination on the basis of sex, pregnancy, marital status and retaliation, in violation of the New York State Human Rights Law, Executive Law § 290 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-107 et seq. (the "City Law"). Castergine also brings this action to remedy defendants' violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA").

3.      Castergine seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate equitable and legal relief pursuant to the Executive Law, the City Law and the FMLA.

JURISDICTION AND VENUE

4.      The Court has jurisdiction over the FMLA claim pursuant to 29 U.S.C. § 2617(a)(2) and 28 U.S.C. § 1331.

5.      The Court has jurisdiction over the Executive Law and City Law claims pursuant to 28 U.S.C. § 1367.

6.      Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the City of New York Corporation Counsel.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Eastern District of New York.

PARTIES

8.      Castergine was employed by the Mets from December 2010 until the involuntary termination of her employment on August 26, 2014.

9.      The Mets are a Major League Baseball franchise located in Queens, New York. The Mets are an "employer" within the meaning of the FMLA, the Executive Law and the City Law.

10.     Wilpon is the Chief Operating Officer of the Mets and, upon information and belief, has an ownership interest in the Team. He is an "employer" within the meaning of the FMLA, the Executive Law and the City Law.

FACTUAL ALLEGATIONS

Background

11.     Castergine graduated from the University of Pennsylvania ("Penn") in 2003 with a degree in economics. While at Penn, she was a member of the first team in the school's history to reach the NCAA Division 1 women's soccer tournament.

12.     After graduation, Castergine's goal was to break into the world of sports management. She started her journey by working for $6 per hour as a ticket agent for the Philadelphia 76ers. Castergine progressed quickly and worked her way through successively more senior jobs with the Philadelphia Flyers, Orlando Magic and Boston Bruins.

13.     By 2010, Castergine had developed a specialty in data analytics and pricing strategy, which involves analyzing customer data and buying patterns to predict revenue.

14.     In or about November 2010, William Sutton ("Sutton"), a consultant for the Mets, began to recruit Castergine to join the Team as its Vice President of Ticket Sales and Service. Castergine ultimately accepted employment with the Mets on December 15, 2010.

### Castergine's Employment with the Mets

15.     Castergine faced significant challenges in her new job. First and foremost, the Team had not made the playoffs since 2006 and had come off two straight losing seasons. The Team has not had a winning season since 2008. Moreover, the Team has been unable to acquire premier talent, in part, because of its serious financial woes. Indeed, since Castergine's arrival in 2010, the Team has finished near the bottom of its division for three consecutive years and is on pace to do so again in 2014. The Team has also either traded away or failed to re-sign some of its marquee players and biggest fan attractions, including the 2011 National League batting champion Jose Reyes and 2012 National League Cy Young Award winner R.A. Dickey.[1]

16.     The Team's ownership and front office have only made things worse. For example, Mets' executives persisted in publicly denying the Team's financial difficulties despite the obvious freefall in player payroll, further frustrating the Team's fanbase. Indeed, each season the Mets' front office insisted that the Team had the ability to spend money on new players, only to see payroll drop even further.[2] Some fans had become so disenchanted that they pledged not

---

[1] The Cy Young Award is given annually to the best pitcher in each of Major League Baseball's two leagues.

[2] From 2009 to 2014, the Team's payroll dropped by nearly $60 million, from over $142 million to less than $83 million. Although the Mets play in one of the largest, if not the largest, sports markets in the country, its payroll is among the bottom third in baseball. By comparison, the 2014 payroll for the top five teams in baseball ranges from $162 million to $235 million.

to attend any games until there was a change in ownership. Others compared Castergine's job to selling "deck chairs on the [T]itanic" or "tickets to a funeral."

17.     Moreover, the front office has all too often alienated fans by ridiculing the Team's players and, at times, its own fans. For example, at the beginning of the 2011 season, the Team's principal owner, Chairman and Chief Executive, Fred Wilpon (Jeffrey Wilpon's father), disparaged some of the Team's most popular players in an article published in *The New Yorker*. He referred to Reyes, the Team's all-star shortstop, as "having everything wrong with him"; Carlos Beltran, the Team's star outfielder, as being only "sixty-five to seventy percent of what he was"; and David Wright, the Team's perennial all-star third baseman and most popular Met, as "a very good player" but "not a superstar." Fred Wilpon described the 2011 Mets as a "shitty team."

18.     More recently, the front office has blamed the fans for the Team's woes, suggesting that if more fans attended games, the Team would invest more money in players. Needless to say, the fans were unhappy.

19.     Castergine also discovered that the Team had significantly overpriced its tickets upon the opening of the Team's new ballpark in 2009. Apparently, prior to Castergine's arrival, the Team's front office inflated ticket prices to keep pace with its cross-town rival New York Yankees. Team ownership insisted on the markup despite being aware that higher prices might cause fans to avoid coming to games.

20.     Castergine excelled despite these challenges. She built a computerized Customer Relationship Management system to track data about ticket purchases. Prior to Castergine's arrival, the Mets collected data on index cards. She also dedicated a segment of the sales force to focus on group ticket sales, built a full-time sales team, hired new talent managers,

negotiated new state-of-the-art ticketing facilities for the Team and introduced dynamic pricing (setting ticket prices based on demand). She also introduced major pricing changes, new benefits, and a flexible exchange policy for season ticket holders. She also was responsible for introducing flexible partial season ticket plans, where fans could select the specific games they wanted to attend as part of a partial season ticket purchase, which was well received by fans.

21.    Both the Mets and the industry recognized Castergine's significant accomplishments in the face of long odds. The Team rewarded Castergine with a $50,000 raise in 2012 and a second $50,000 raise in August 2013 (retroactive to June). That same month, the Mets told Castergine that she would be promoted to Senior Vice President effective December, 2013. A few months later, Castergine was profiled in an industry publication where her peers described her as "the next female President in the sports industry."

22.    Castergine also earned annual six-figure bonuses based on meeting certain sales goals. For example, in 2013, Castergine earned a $125,000 bonus because the Mets generated over $84 million in ticket sales.

<u>Castergine's Pregnancy</u>

23.    In August 2013, Castergine learned she was pregnant. Her excitement, however, quickly turned to concern.

24.    In or about the beginning of September, 2013, Castergine attended a meeting with her immediate supervisor Lou DiPaoli ("DiPaoli"), the Team's Executive Vice President and Chief Revenue Officer, and a few other senior male executives. DiPaoli and the executives began to discuss a female employee in the Mets public relations department who, according to one male executive, "hasn't been the same since she had children." They discussed

moving the female employee to a new department. The conversation made Castergine extremely uncomfortable given that she was then pregnant, although she had not yet told anyone.

25.     Despite her unease, in or about late September 2013, Castergine told Wilpon and DiPaoli that she was pregnant. As Castergine would later learn, Wilpon was not pleased about the news because, in his view, Castergine should not have a baby without getting married first.

26.     From the time Castergine announced her pregnancy in September 2013 (just one month after she received a $50,000 raise and was told that she would be promoted), Wilpon began to humiliate Castergine and disparage her in front of her colleagues. For example:

a.      In or about October 2013, Wilpon told one of Castergine's colleagues that he is "old fashioned and thinks [Castergine] should be married before having a baby";

b.      Also in or about October 2013, Wilpon walked into a meeting of Mets' senior executives and leaned over Castergine to see if she was wearing an engagement ring;

c.      Also in or about October 2013, Wilpon walked into a meeting and publicly announced "two rules" regarding Castergine's pregnancy: "don't touch her belly and don't ask how she's doing; she's not sick, she's pregnant"; and

d.      In or about December 2013, while discussing Castergine's bonus, Wilpon told Castergine that she should tell her boyfriend that when she gets a ring, she will make more money and get a bigger bonus.

27.     Castergine had a difficult pregnancy. Beginning in August 2013, she experienced severe morning sickness. In January 2014, while attending an early morning senior staff meeting, she collapsed and had to be driven home. She eventually discovered that she had

Intrahepatic Cholestasis of Pregnancy (or "ICP") - a rare pregnancy-related condition that required Castergine be induced into labor to avoid a stillbirth.

28.     Wilpon, however, did not stop harassing Castergine about her pregnancy. In or about February 2014, Castergine attended a meeting with Wilpon and six other senior executives, all of whom were men, including the Team's General Counsel. The group discussed whether to accept advertising from an e-cigarette company. Wilpon stated, "I am as morally opposed to putting an e-cigarette sign in my ballpark as I am to Leigh having this baby without being married." No one, including the Team's General Counsel, challenged Wilpon's discriminatory statement. Castergine felt humiliated.

29.     Also in February 2014, Wilpon told one of Castergine's colleagues that "she [Castergine] is a senior vice president now; people would respect her more if she was married."

Castergine Complains About Wilpon

30.     The Mets' Employee Handbook purports to prohibit discrimination and "[r]etaliation for reporting harassment." According to the Handbook, the Team's anti-discrimination and anti-retaliation policy "applies to all member of the Organization," including "officers," such as Wilpon. The Handbook instructs employees to complain about discriminatory conduct to their supervisor, the Team's General Counsel or the Senior Director of Human Resources and promises that "[a]ll incidents of inappropriate conduct or prohibited harassment that are reported will be investigated." In fact, the Mets neither investigated nor took any steps to stop Wilpon's discriminatory behavior.

31.     The Mets' General Counsel, David Cohen, and Castergine's supervisor, DiPaoli, were aware of Wilpon's behavior because they were present when Wilpon made sexist

comments to Castergine. Neither one did anything to stop it or even, at minimum, reported Wilpon's behavior as they were required to do.

32. In addition, Castergine complained to DiPaoli that Wilpon had stated that she would be respected more if she got married. DiPaoli acknowledged that Wilpon made the statement. DiPaoli, however, dismissed Castergine's complaint without taking any action. In fact, DiPaoli's treatment of Castergine became more hostile after her complaint to him about Wilpon.

33. Castergine then turned to Holly Lindvall ("Lindvall"), the Team's Executive Director of Human Resources. In or about late February or early March 2014, Castergine approached Lindvall about the way she was being treated. She explained to Lindvall that DiPaoli was treating her disrespectfully. She also told Lindvall about Wilpon's discriminatory comments. Lindvall did nothing. She instead urged Castergine to quit.

Castergine's Return From Maternity Leave

34. Castergine continued to do her job through March 7, 2014 - three days before she gave birth. She returned from maternity leave on June 1, 2014.

35. Given Wilpon's statements and the reaction from Human Resources, Castergine understood that the Mets no longer wanted her to remain with the Team. She began to explore other opportunities, including meeting with an executive from a professional hockey franchise while on leave. Castergine ultimately did not pursue the opportunity. Nevertheless, Wilpon confronted Castergine and told her that it would not be a "big deal" if she left.

36. In or about July 2014, Castergine again approached Lindvall about the discrimination she was experiencing. Lindvall again urged Castergine to quit. In particular,

Lindvall stated that she knew Castergine had bigger aspirations but there were no bigger opportunities for her with the Mets.

37.     Shortly thereafter, in or about early August 2014, the Mets for the first time approached Castergine about purported "issues" with her performance. These "issues" were, in fact, trumped up.

Wilpon Fires Castergine

38.     On August 20, 2014, Wilpon fired Castergine. Wilpon's asserted reason was Castergine's failure to meet her sales goals. Wilpon expressed his belief that "something changed" with Castergine and that she was no longer "as aggressive as she once had been."

39.     In fact, Wilpon fired Castergine based on his discriminatory views. Castergine had been on maternity leave for much of the 2014 baseball season. Therefore, many of the decisions regarding ticket sales and promotions were made by DiPaoli, Castergine's boss, who was in his first full season with the Team and instituted changes that frequently hurt ticket sales.

40.     Wilpon offered Castergine a severance package that included the opportunity to remain employed through the end of the 2014 season. In order to receive the severance, however, Castergine had to agree (a) not to pursue any legal claims against the Mets or Wilpon, including claims of harassment and discrimination; (b) to keep the circumstances of her departure confidential; and (c) not to say negative things about the Mets or its employees, including Wilpon.

41.     Wilpon gave Castergine until August 25, 2014 - or only three business days - to sign the agreement. When Castergine asked for an additional week to review the legal document, Wilpon refused. He would permit her only an additional 24 hours.

42.    On August 26, 2014, the day Wilpon demanded that Castergine return the agreement, Castergine told one of her colleagues that she had decided to hire counsel. Her colleague responded, "Understood but it could end unpleasantly today." The colleague further warned Castergine that "he [Wilpon] will terminate you today if you don't talk and come to a[n] agreement."

43.    At 12:11 p.m. on August 26, 2014, Castergine's counsel sent an email to Lindvall asserting Castergine's discrimination and retaliation claims. Less than three minutes later, the Mets fired Castergine by email.

44.    Upon information and belief, later that same day, in an obvious attempt to punish Castergine for asserting her legal rights, the Mets leaked news of Castergine's firing to the press.

## FIRST CAUSE OF ACTION

### (FMLA)

45.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 44 of this Complaint as if set forth herein.

46.    By the acts and practices described herein, defendants interfered with, restrained, denied plaintiff, and retaliated against her for exercising, her rights under the FMLA, in violation of the FMLA, 29 U.S.C. §§ 2612(a), 2614(a)(1), and 2615(a)(1).

47.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other monetary damages unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

## (EXECUTIVE LAW - DISCRIMINATION)

48.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 47 of this Complaint as if set forth herein.

49.     Defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex, pregnancy and marital status in violation of the Executive Law.

50.     As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

## (EXECUTIVE LAW - RETALIATION)

51.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 50 of this Complaint as if set forth herein.

52.     By the acts and practices described above, defendants have retaliated against plaintiff for her opposition to unlawful employment practices in violation of the Executive Law.

53.     Plaintiff is now suffering irreparable injury and monetary damage from defendants' retaliatory conduct and will continue to do so unless and until the Court grants relief.

## FOURTH CAUSE OF ACTION

## (CITY LAW - DISCRIMINATION)

54.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 53 of this Complaint as if set forth herein.

55.     Defendants discriminated against plaintiff in the terms and conditions of her employment based on her sex, pregnancy and marital status in violation of the City Law.

631281 v9                          12

56. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

FIFTH CAUSE OF ACTION

(CITY LAW - RETALIATION)

57. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 56 of this Complaint as if set forth herein.

58. By the acts and practices described above, defendants have retaliated against plaintiff in violation of the City Law.

59. Plaintiff is now suffering irreparable injury and monetary damage from defendants' retaliatory conduct and will continue to do so unless and until the Court grants relief.

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to be violations of the FMLA, the Executive Law, and the City Law;

(b) enjoining and permanently restraining these violations of the FMLA, the Executive Law, and the City Law;

(c) directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendants to place plaintiff in the position she would have occupied but for defendants' discriminatory and retaliatory treatment of her, and making her whole for all earnings and other benefits she would have received but for defendants' discriminatory and retaliatory treatment, including but not limited to wages, pension, and other lost benefits;

       (e)     directing defendants to pay plaintiff an additional amount as liquidated damages for violations of the FMLA;

       (f)     directing defendants to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

       (g)     directing defendants to pay plaintiff additional amounts as punitive damages;

       (h)     awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

       (i)     awarding plaintiff the costs of this action, together with reasonable attorneys' fees, as provided by the FMLA, and by the City Law; and

       (j)     awarding such other and further relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
       September 10, 2014

                             VLADECK, WALDMAN, ELIAS
                             & ENGELHARD, P.C.

                   By: _Anne C. Vladeck_
                       Anne C. Vladeck
                       Valdi Licul
                       Attorneys for Plaintiff
                       1501 Broadway, Suite 800
                       New York, New York  10036
                       (212) 403-7300